EXHIBIT A

OFFICE OF
## CLERK OF SUPERIOR COURT
STRAFFORD COUNTY

GRIMES JUSTICE AND
ADMINISTRATION BUILDING
P.O. BOX 799
DOVER, NEW HAMPSHIRE
03821-0799

JULIE W. HOWARD, CLERK
SUSAN W. ASHLEY, DEPUTY CLERK
SUZANNE R. DOYLE, DEPUTY CLERK

(603) 742-3065
TTY/TDD Relay Number
1-800-735-2964

## THE STATE OF NEW HAMPSHIRE

### RECEIPT OF WRIT

DATE: February 23, 2005

DOCKET NUMBER: 05-C-049

C. BETH MAHONEY

v.

INTERNATIONAL PAPER CO., NORSKE SKOGINDUSTRIER ASA, NORSKE SKOG NORTH AMERICA LLC, NORSKE SKOG (USA) INC., NORSKE SKOG (USA) HOLDINGS, Inc., NORSKE SKOG CANADA LIMITED, NORSKE SKOG CANADA (USA) INC., STORA ENSO OYJ, STORA ENSO NORTH AMERICA CORPORATION, SAPPI LIMITED, S.D. WARREN COMPANY D/B/A SAPPI FINE PAPER NORTH AMERICA, METSALITTO GROUP, METSALLITTO COOPERATIVE, M-REAL CORPORATION, M-REAL USA CORP., UPM-KYMMENE CORPORATION, MYLLYSKOSKI CORP., MADISON INTERNATIONAL SALES COMPANY

The writ in the above-captioned matter was filed with the Clerk of this Court on: February 18, 2005 at 12:33 pm.

The plaintiff or his/her attorney is to attach a copy of this receipt to identical copies of the original writ and deliver them to the Sheriff or other legally authorized entity for service on each named defendant. Sufficient copies shall be provided to allow for a service copy for each named defendant and a copy for each officer completing service to compete the return. The return copies shall be filed with the Court in accordance with *Superior Court Rule 3.*

BY ORDER OF THE COURT

*Julie M Howard*

Julie W. Howard, Clerk
Strafford Superior Court
P.O. Box 799
Dover, NH 03821-0799
(603) 742-3065

Date Served   03-07-2005
on   C Beth Wortman,
the defendant or a person of discretion
residing at the defendant's residence.
By:
Ward County Sheriff's Department

# The State of New Hampshire

## SUPERIOR COURT

STRAFFORD COUNTY

(   ) COURT
( XX) JURY

### WRIT OF SUMMONS

C. Beth Mahoney
436 Beccaris Drive
Rollinsford, NH  03869

See attached
Defendant Listing

v.

The Sheriff or Deputy of any County is ordered to summon each defendant to file a written appearance with the Superior Court at the address listed below by the return day of this writ which is the first Tuesday of ___April 2005___ ,

MONTH

_____
YEAR

The PLAINTIFF(S) state(s):

See attached.

and the Plaintiff(s) claim(s) damages within the jurisdictional limits of this Court.

February 17, 2005

DATE OF WRIT

_____
INDORSER (sign and print name)

#### NOTICE TO THE DEFENDANT

The Plaintiff listed above has begun legal action against you. You do not have to physically appear in Court on the return day listed above since there will be no hearing on that day. However, if you intend to contest this matter, you or your attorney must file a written appearance form with the Clerk's Office by that date. (Appearance forms may be obtained from the Clerk's Office.) You will then receive a notice from the Court of all proceedings concerning this case. If you fail to file an appearance by the return day, judgment will be entered against you for a sum of money which you ill then be obligated to pay.

Witness, Robert J. Lynn, Chief Justice, Superior Court.

SIGNATURE OF PLAINTIFF/ATTORNEY
D. Michael Noonan
Shaheen & Gordon, P.A.

Julie W. Howard, Clerk
NH Superior Court Strafford County
County Farm Road PO Box 799
Dover NH 03821-0799
(603) 742-3065

PRINTED/TYPED NAME
P O Box 977

ADDRESS.
Dover, NH  03821-0977    /    (603) 749-5000

PHONE

213-003-7

## CLASS ACTION COMPLAINT

## INTRODUCTION

Individual and class representative Plaintiff C. Beth Mahoney, on behalf of herself and all others similarly situated, alleges as follows:

## NATURE OF THIS ACTION

1.     This case arises out of a massive international conspiracy beginning in or around January 1, 1990 and continuing through to the present among all Defendants and their co-conspirators with the purpose and effect of fixing prices, eliminating and suppressing competition, and committing other unlawful practices designed to inflate and stabilize the prices of uncoated and coated magazine paper ("Magazine Paper") sold to or distributed to the Plaintiff and other purchasers in New Hampshire and throughout the United States of America.

2.     Defendants' conspiracy has involved illegal conduct by an international cartel that has targeted consumers and other indirect purchasers in New Hampshire and throughout the United States.  The conspiracy has affected millions of dollars of commerce in Magazine Paper products found in virtually every household in New Hampshire.

3.     The conspiracy has included covert communications and meetings in which Defendants expressly agreed to eliminate competition and fix prices of Magazine Paper sold in and/or distributed to New Hampshire.

4.     Plaintiff brings this action pursuant to NH RSA 358-A:1 et seq. to obtain injunctive relief and to recover damages and the costs of suit, including reasonable attorneys' fees, from Defendants for the injuries sustained by the Plaintiff and the Class (as defined herein) by reason of Defendants' egregious violations of New Hampshire law.

5.     Plaintiff brings this claim exclusively under New Hampshire state law and not under sections 4 or 6 of the Clayton Act (15 U.S.C. §§15, 26), or section 1 of the Sherman Act (15 U.S.C. §1).  Neither the Plaintiff nor any member of the Class has damages exceeding $75,000 each even when trebled.  Attorneys' fees on a pro-rata basis will not exceed $75,000 for

each class member.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to N.H. RSA 358-A:1 et seq.

7.    This Court has jurisdiction over the parties because during the Class Period, the Defendants resided, transacted business, were found, or had agents in the State of New Hampshire, and because a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in the State of New Hampshire.

## PARTIES

8.    Plaintiff C. Beth Mahoney, is a resident of the State of New Hampshire.  During the time period covered in this Complaint, Plaintiff purchased products for personal use which contained Magazine Paper, including but not limited to magazines, sold by one or more of the Defendants, their subsidiaries, divisions, units or affiliates within the State of New Hampshire. As a result, Plaintiff has been injured by reason of the antitrust violations and deceptive practices alleged herein.  Plaintiff brings this action in her individual and representative capacity on behalf of the Plaintiff Class alleged herein in paragraph 56 hereof.

9.    Defendant International Paper Co. ("IP") is a New York corporation with its headquarters located at 400 Atlantic Street, Stamford, CT 06921.  During the Class Period, IP, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

10.    During the Class Period, IP directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in

2

and/or distributed to New Hampshire. These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

11.    During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, IP controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in New Hampshire.

12.    Defendant Norske Skogindustrier ASA ("Norske Skog") is a Norwegian company with its headquarters located at Oksenoyveien 80, 1326 Lysaker, Norway. During the Class Period, Norske Skog, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

13.    During the Class Period, Norske Skog directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire. These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

14.    Defendant Norske Skog North America LLC ("Norske Skog North America") is a Delaware limited liability company with its principal place of business located at 1011 Western Avenue, Suite 700, Seattle, WA 98104. Norske Skog North America was formed on July 1, 2002, and is jointly owned by Defendants Norske Canada and Norske Skog. During the Class Period, Norske Skog North America, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

3

15.     During the Class Period, Norske Skog North America directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire.  These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

16.     Defendant Norske Skog (USA), Inc. ("Norske Skog USA") is a Delaware corporation with its principal place of business located at 2507 Post Road, Southport, CT 06890. Norske Skog USA is a wholly-owned subsidiary of Defendant Norske Skog.  During the Class Period, Norske Skog USA, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

17.     During the Class Period, Norske Skog USA directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise,  maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire.  These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

18.     Defendant Norske Skog (USA) Holdings, Inc. ("Norske Skog USA Holdings") is a Delaware corporation with its principal place of business located at 2507 Post Road, Southport, CT 06890.  Norske Skog USA Holdings, is a wholly-owned subsidiary of Defendant Norske Skog.

4

During the Class Period, Norske Skog USA Holdings, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

19.     During the Class Period, Norske Skog USA Holdings directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire. These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

20.     Defendant Norske Skog Canada Limited ("Norske Canada") is a Canadian company with its principal place of business located at 250 Howe Street, 16th Floor, Vancouver, Canada V6C 3R8. According to its 2003 Annual Report, Defendant Norske Skog owns approximately 30% of Norske Canada. During the Class Period, Norske Canada, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

21.     During the Class Period, Norske Canada directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire. These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

22.     Defendant Norske Skog Canada (USA), Inc. is a California corporation with its principal place of business located at Suite 700, 1011 Western Avenue, Seattle, WA 98101.

During the Class Period, Norske Skog Canada (USA), Inc., directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

23.     During the Class Period, Norske Skog Canada (USA) directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire.  These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

24.     During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Norske Skog, Norske Skog North America, Norske Skog USA, Norske Skog USA Holdings, Norske Canada, and Norske Skog Canada (USA) controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in New Hampshire.

25.     Defendant Stora Enso Oyj ("Stora Enso") is a Finnish corporation with its principal place of business located at Kanavaranta 1, FIN-00160, Helsinki, Finland.  During the Class Period, Stora Enso, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

26.     During the Class Period, Stora Enso directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire.  These horizontal-pricing practices restrained trade or

6

commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

27. Defendant Stora Enso North America Corporation ("Stora Enso North America") is a Wisconsin corporation with its principal place of business located at 231 First Avenue North, Wisconsin Rapids, WI 54495. During the Class Period, Stora Enso North America, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

28. During the Class Period, Stora Enso North America directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire. These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

29. During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Stora Enso and Stora Enso North America controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in New Hampshire.

30. Defendant Sappi Limited ("Sappi") is a South African corporation with its principal place of business located at Sappi House, 48 Ameshoff Street, Braamfontein, Johannesburg 2001, Republic of South Africa. In 1994, Sappi acquired Defendant S.D. Warren Company. The S.D. Warren Company now does business as Sappi Fine Paper North America. During the Class

7

Period, Sappi, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

31.    During the Class Period, Sappi directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire.  These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

32.    Defendant S.D. Warren Company ("S.D. Warren"), doing business as Sappi Fine Paper North America, is a Pennsylvania corporation with its principal place of business located at 225 Franklin Street, Boston, Massachusetts, 02110.  In 1994, Defendant Sappi acquired S.D. Warren Company.  S.D. Warren now does business as Sappi Fine Paper North America. During the Class Period, S.D. Warren, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

33.    During the Class Period, S.D. Warren directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire.  These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

34.    During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Sappi and S.D. Warren

8

controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in New Hampshire.

35.     Defendant Metsalitto Group is organized under the laws of the Republic of Finland with its principal place of business located at P.O.B. 10, FIN-02020 METSA, Finland.  During the Class Period, Metsalitto Group, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

36.     During the Class Period, Metsalitto Group directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire.  These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

37.     Defendant Metsalitto Cooperative is organized under the laws of the Republic of Finland with its principal place of business located at Revontulentie 6, FIN- 02100 ESPOO, Finland.  Metsalitto Cooperative is the parent company of Defendant Metsalitto Group, and is a cooperative organization for Finnish forest owners that has approximately 130,000 members.  During the Class Period, Metsalitto Cooperative, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

38.     During the Class Period, Metsalitto Cooperative directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire.  These horizontal-pricing practices

9

restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

39.     During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Metsalitto Group and Metsalitto Cooperative controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in New Hampshire.

40.     Defendant M-real Corporation ("M-real") is a Finnish corporation with its principal place of business located at FIN-02020 METSA, Finland.  During the Class Period, M-real, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

41.     During the Class Period, M-real directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire.  These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

42.     Defendant M-real USA Corp. ("M-real USA") is a New York corporation with its principal place of business located at 301 Merritt 7, Norwalk, CT 06851.  During the Class Period, M-real USA, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

43.     During the Class Period, M-real USA directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set

prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire. These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

44.     During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, M-real and M-real USA controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in New Hampshire.

45.     Defendant UPM-Kymmene Corporation ("UPM") is a Finnish corporation with its principal place of business located at Etelaesplanadi 2, FIN-00101 Helsinki, Finland. During the Class Period, UPM, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

46.     During the Class Period, UPM directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire. These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

47.     During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, UPM controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in New Hampshire.

48.     Defendant Myllykoski Corporation ("Myllykoski") is a Finnish corporation with its principal place of business located at Etelaesplanadi 20, FIN-00130 Helsinki, Finland. During the

11

Class Period, Myllykoski, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

49.     During the Class Period, Myllykoski directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire. These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

50.     Defendant Madison International Sales Company ("Madison") is Delaware corporation with its principal place of business located at 101 Merritt 7, Norwalk, CT 06851. Madison is the U.S. sales company for the Myllykoski Group of paper mills. During the Class Period, Madison, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

51.     During the Class Period, Madison directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to New Hampshire. These horizontal-pricing practices restrained trade or commerce in New Hampshire and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in New Hampshire.

52.     During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Myllykoski and Madison controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in New Hampshire.

53.    The Defendants named in the Complaint are collectively referred to as the "Defendants." The acts charged in this Complaint as having been done by Defendants were authorized, ordered or done by their officers, directors, agents, employees or representatives while they have actively engaged in the management, direction, control, or transaction of the Defendant's business or affairs.  Whenever any reference is made in this Complaint to any corporate Defendant, such reference shall be deemed to include predecessors, successors, parents, subsidiaries, affiliates, and divisions of that corporation.  The Defendants have exclusive possession and control over the documents further evidencing their acts as set forth.

54.    Each of the Defendants acted in concert and/or as authorized agents of each other during the Class Period.  Each Defendant conspired with each other to commit the unlawful, unfair or deceptive acts or practices referenced herein.  Each Defendant so transacted business in the state of New Hampshire, benefited from New Hampshire laws, and/or caused loss or damage though its acts or omissions.  Each Defendant conducts business in New Hampshire on a regular basis and derives substantial revenues from services rendered or goods used or consumed.

55.    Various other individuals, partnerships, corporations, and other business entities, unknown to the Plaintiff, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## CLASS ACTION ALLEGATIONS

56.    Plaintiff brings this action on her own behalf and as a class action under the provisions of Rules 27-A of the New Hampshire Rules of Civil Procedure on behalf of all members of the following class:

> All individuals or entities (excluding governmental entities, Defendants, their parents, subsidiaries and affiliates, and their co-conspirators) in the State of New Hampshire who indirectly purchased products containing Magazine Paper manufactured or sold by any of

13

the Defendants or any subsidiary or affiliate thereof, or any co-conspirator, at any time during the period from January 1, 1990 through the present (the "Class Period").

57.    This action seeks equitable relief and recovery for economic injuries suffered by the Plaintiff and all indirect purchasers of Magazine Paper.

58.    Plaintiff does not know the exact size of the Class.  However, based upon the nature of trade and commerce involved, Plaintiff believes that the total number of class members is in the tens of thousands, and that members of the Class are geographically dispersed throughout the State of New Hampshire. Therefore, joinder of all members of the Class is not practicable.

59.  ·  There are questions of law and fact common to the Class, including, but not limited to:

   a.    whether the Defendants engaged in an unlawful contract, combination or conspiracy among themselves, express or implied, to fix, raise, maintain, or stabilize prices of Magazine Paper sold in and/or distributed in New Hampshire;

   b.    whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control and/or maintain the prices of Magazine Paper sold in and/or distributed in New Hampshire;

   c.    the existence and duration of the horizontal agreements alleged herein to fix, raise, maintain and/or stabilize the prices for Magazine Paper sold in and/or distributed in New Hampshire;

   d.    whether the Defendants concealed the contract, combination or conspiracy from Plaintiff and the other members of the Class;

14

e.  whether Defendants' agents, officers, employees or representatives participated in communications and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

f.  whether the Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce;

g.  whether the Defendants' conduct caused retail prices of Magazine Paper to be sold at artificially high levels;

h.  whether the Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate class-wide measure of damages; and

i.  whether the Plaintiff and the other members of the Class are entitled to declaratory and/or injunctive relief.

60.  These and other questions of law and fact are common to the Class and predominate over any question affecting only individual members of the Class.

61.  Plaintiff's claims are typical of the claims of all members of the Class in that Plaintiff was an indirect purchaser of Magazine Paper and the relief sought is common to the Class.

62.  Plaintiff is a member of the Class and will fairly and adequately represent the interests of the Class, in that the Plaintiff is a typical indirect-purchaser of Magazine

15

Paper and has no conflicts with, or interests antagonistic to, other members of the Class. Furthermore, Plaintiff has retained competent counsel experienced in class action and consumer protection litigation.

63.     This Class action is superior to any alternatives for the fair and efficient adjudication of this controversy because:

a.     it will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.     it would be virtually impossible for all Class members to intervene as parties-plaintiff in this action;

c.     it will allow numerous individuals or entities with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d.     as a class action it is appropriate for treatment on a fluid recovery basis, which will obviate any manageability problems; and

e.     it will provide court oversight of the claims process, once Defendants' liability is adjudicated.

## FACTS

64.     Plaintiff realleges and incorporates the preceding paragraphs as alleged herein.

65.     The term "Magazine Paper" includes both uncoated magazine paper and coated magazine paper. As Defendant Stora Enso states on its website, uncoated magazine paper "is used mainly for periodicals and advertising material, such as inserts and flyers. It is also suitable for mass circulation TV magazines and catalogues." With respect to coated magazine paper, Defendant Stora Enso states on its website that it is available "in various matt, silk and glossy

16

grades [and] is used for special interest and general interest magazines. Other end-uses include supplements, upmarket and home-shopping catalogues, and magazine covers."

66.    Each of the Defendants are engaged in the manufacture, sale and/or distribution of Magazine Paper throughout the United States and State of New Hampshire.

67.    The unlawful business activities of the Defendants that are subject of this Complaint were within the flow of and substantially affected trade and commerce directly or indirectly injuring and affecting Plaintiff and the Class.

68.    Defendants Stora Enso, UPM, Sappi and Norske Skog are among Europe's largest paper manufacturing groups. Defendant Stora Enso is the world's largest paper producer. Its primary markets are Europe, North America and Asia.

69.    Defendant UPM dominates the magazine paper market as the world's largest Magazine Paper maker, and is one of the top three paper makers in the world. UPM has 22 paper mills in eight countries, including the U.S., and 3,200 customers in 120 countries.

70.    Defendant Sappi is the largest producer of coated fine paper used for glossy magazines. Sappi sells 43% of its products in Europe and 30% in North America.

71.    Defendant Norske Skog ranks in the top three of Europe's paper business and is the world's largest producer of newspaper. Although Norway is not a part of the European Union, Norske Skog is subject to EU antitrust regulations through a treaty linking the Norwegian and EU markets.

72.    Defendant IP is the number one producer of uncoated papers worldwide and coated papers in North America. It is the top paper producer in the United States.

## MAGAZINE PAPER CRIMINAL INVESTIGATION

17

73.   In the spring of 2003, Defendant UPM initiated an internal investigation of competitive practices in all of its business units. At the conclusion of its internal investigation, on January 15, 2004, Defendant UPM contacted the competition authorities in the European Union, the United States and Canada.

74.   On January 30, 2004, two weeks after approaching the competition authorities, UPM's CEO, Juha Niemela, resigned.

75.   On May 25, 2004, the United States, Canadian and European authorities launched an investigation into alleged collusion among the world's top forestry firms. Raids were carried out by local or European antitrust authorities at UPM, Stora Enso, Metsalitto, M-real, Sappi and Norske Skog.

76.   On May 25, 2004, the Reuters news agency reported the following:

> A swathe of leading global forestry firms were raided by competition enforcers on Tuesday as part of antitrust operations on both sides of the Atlantic regarding price-fixing and manipulation of markets for various paper products.
>
> Raids were carried out by local or European Union antitrust authorities at Finland's UPM-Kymmene, Stora Enso, Metsalitto and M-real and Norway's Norske Skog. U.S. and Canadian authorities cooperated.
>
> International Paper Co., the top North American forest products company, said it had been contacted by U.S. officials in connection with the probe.
>
> Later on Tuesday, the U.S. Justice Department confirmed it is investigating possible anti-competitive practices in the market for magazine paper. A department spokeswoman said the probe covers the sale of magazine paper in the United States and elsewhere.
>
> The investigation also reached South Africa, where pulp and paper maker Sappi said its European head office had been raided. The company, the largest producer of fine paper used for glossy magazines, said it had agreed to cooperate with EU officials.

77.   On May 25, 2004, the United States Department of Justice issued a subpoena for documents to Defendant Stora Enso North America.

18

78. On May 25, 2004, Defendant IP disclosed that it had been contacted by the United States Department of Justice in connection with the probe into price-fixing in the Magazine Paper market.

79. Following the raids, the European Commission issued the following press release regarding the investigation:

> Following press inquiries, the European Commission's spokesperson for Competition has confirmed that, on 25 May 2004, Commission inspectors, assisted by officials from the national competition authorities of the Member States concerned, launched simultaneous unannounced inspections at the premises of some of the major European producers of paper and forestry products.

> The purpose of these inspections is to ascertain whether there is evidence of cartel agreements and related illegal practices concerning price fixing, fixing of other commercial terms, and/or allocation of customers. Several product markets in the European paper and forestry products sector would be affected by the alleged arrangements.

> The Commission's spokesperson has also confirmed that the inspections have been carried out in close coordination with competition authorities in a number of EU countries, as well as the US and Canada. The EFTA Surveillance Authority, at the request of the Commission, participated in the inspections at premises of undertakings in the EFTA Member States.

> Surprise inspections are a preliminary step in investigations into suspected cartels.

80. Commenting on the investigation, a spokeswoman for the United States Department of Justice stated that the investigation involves "anticompetitive practices in the sale of Magazine Paper in the U.S. and elsewhere."

81. Canada's Competition Bureau has also confirmed that it was investigating alleged price-fixing and cartel arrangements in the paper and forest products industry.

82. On May 25, 2004, the EFTA Surveillance Authority, an organization charged with enforcing competition laws with respect to EFTA Member States Iceland, Liechtenstein and Norway, issued a press release stating:

19

Following inquiries from journalists, the EFTA Surveillance Authority confirms that on 25 May 2004, inspectors from the EFTA Surveillance Authority, assisted by officials from the Norwegian Competition Authority, carried out an unannounced inspection at the premises of a producer of publication paper in Norway. The purposes of the inspection is to ascertain whether there is evidence of cartel agreements and related illegal practices among EEA producers of publication paper and amongst acquirers of recovered paper.

83.    On May 25, 2004, UPM's General Counsel, Reko Aalto-Setaelae, stated that the investigation concerns "many" of the company's products and that "unfortunately many of our employees have been involved." Aalto-Setaelae also added that the practices under investigation may date back to the early 20th century.

84.    On May 25, 2004, Defendant Stora Enso issued a press release in which it stated the following:

> European Commission competition investigators have today visited Stora Enso's premises in London, Stockholm, and Dusseldorf.
>
> Representatives of the Finnish Competition Authority visited Stora Enso Forest's office at Imatra and regional offices at Summa, Joensuu, Savonlinna and Kuopio in Finland.
>
> In addition, the Company's North American division has received a subpoena for documents from the Antitrust Division of the US Department of Justice.

85.    On May 28, 2004, it was reported that Jukka Harmala, CEO of Defendant Stora Enso, told a forest industry seminar that "[t]he time span (of the investigation)...is likely not focusing on the past few years, but can go back as far as (the) late eighties."

86.    On May 28, 2004, it was reported that Stora Enso's CEO stated that the investigation may lead back to the late 1980s.

87.    On May 28, 2004, it was also reported that Carl Bjornherg, CEO of Defendant Myllykoski, stated at the same seminar that the industry had been "very much cartelized" during at least a portion of the Class Period.

20

88. On May 28, 2004, Defendant UPM issued a press release and stated the following:

European Commission investigators have today visited various UPM premises in connection with a Commission investigation of alleged antitrust activities.

In spring 2003, UPM initiated an internal investigation of competitive practices in all its units. At the same time the company also implemented additional competition law compliance programs for its employees clearly signaling zero tolerance for any antitrust activity.

On January 15, 2004, after the internal investigation and to follow sound principles of corporate governance UPM decided to approach competition authorities in the European Union, the United States and Canada.

The EU, several of its member states, and Canadian authorities have informed [sic] that UPM has received conditional full immunity with respect to certain conduct disclosed to the authorities. In the United States, where a grand jury investigation was already pending with respect to [sic] pressure sensitive labelstock business, UPM continues to cooperate with the US Department of Justice in its investigation.

## VIOLATIONS AND EFFECTS

89. Plaintiff realleges and incorporates the preceding paragraphs as alleged herein.

90. Beginning on or about January 1, 1990, the exact date being unknown to Plaintiff, Defendants, by and through their officers, directors, employees, agents, or other representatives entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce.

91. Defendants' contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain or stabilize the price of Magazine Paper in the State of New Hampshire.

92. Defendants have exclusive possession, custody and control of all documents detailing the inherently self-concealing price-fixing conspiracy.

93. Upon information and belief, for the purpose of formulating and effectuating the

21

aforesaid contract, combination or conspiracy, Defendants did contract, combine and conspire to fix, raise, maintain or stabilize the prices for Magazine Paper, by among other things:

    a.    participating in a meeting and conversations to discuss the prices and/or allocate the market for Magazine Paper sold in the United States and in the State of New Hampshire;

    b.    agreeing, during the meeting and conversations to manipulate prices and supply to boost sagging Magazine Paper sales in the United States and in the State of New Hampshire;

    c.    issuing price announcements and price quotations in accordance with the agreements reached;

    d.    selling Magazine Paper to customers in the United States and state of New Hampshire at non-competitive prices; and

    e.    agreeing to conceal and keep secret their illegal agreement.

94.    Upon information and belief, for purposes of forming, carrying out, policing, monitoring and enforcing the aforesaid contract, combination or conspiracy, Defendants have exchanged, communicated and signaled through themselves confidential information and have thereby fixed, raised, maintained and stabilized Magazine Paper price levels at supra-competitive levels from 1990 through to the present.

95.    The aforesaid contract, combination or conspiracy has had the following effects, among others:

    a.    price competition in the sale of Magazine Paper by Defendants and their co-conspirators has been restrained, suppressed and eliminated;

22

    b.    prices for Magazine Paper sold by Defendants and their co-conspirators have been fixed, raised, maintained or stabilized at artificially high and noncompetitive levels; and

    c.    Plaintiff and the Class have been deprived of the benefit of free and open competition.

96.    By reason of the alleged conspiracy, Plaintiff and each member of the Class paid more for products containing Magazine Paper than they would have paid in the absence of the illegal, contract, combination or conspiracy.  Plaintiff and the Class have been injured in their business and property and have suffered monetary damages in an amount to be proven at trial.

## FRAUDULENT CONCEALMENT

97.    Throughout the Class Period set forth in this Complaint, Defendants effectively, affirmatively and fraudulently concealed their unlawful contract, combination or conspiracy from Plaintiff and the Class.

98.    Defendants engaged in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

99.    Defendants' wrongful conduct as alleged in this Complaint was carried out through means and methods which were designed and intended to avoid detection, and which in fact successfully precluded detection for a substantial period of time.

100.    Because the contract, combination or conspiracy was intentionally kept secret by Defendants and their co-conspirators, Plaintiff was unaware of the fact that prices of Magazine Paper were secretly agreed upon as alleged herein until at the earliest May 24, 2004, when announcements were made that the United States Department of Justice was investigating anti-competitive practices in the sale of Magazine Paper in the United States and elsewhere.

101.   Although Plaintiff exercised due diligence during the Class Period, Plaintiff could not have discovered the self-concealing contract, combination or conspiracy at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.  These techniques of secrecy included, but were not limited to, secret and surreptitious communications and falsely attributing price increases to competitive factors.

102.   Throughout the Class Period, Defendants publicly stated that Magazine Paper prices were raised and otherwise affected in the State of New Hampshire due to facially plausible and legitimate factors unrelated to Defendants illegal and anti-competitive conduct.

103.   As a result of the fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations with respect to any claims and rights of action that Plaintiff and other Class members have as a result of the unlawful contract, combination and conspiracy alleged in this Complaint.

## COUNT I

### [Violation of New Hampshire Consumer Protection Statute RSA 358-A:2]

104.   Individual and Representative Plaintiff, on behalf of herself and the Class, realleges, as if fully set forth, each and every prior allegation contained hereinabove, and further alleges, as follows, against all Defendants:

105.   Plaintiff and the Class purchased in the State of New Hampshire and paid out-of-pocket for products containing Magazine Paper primarily for personal use.

24

106.   The conspiracy, acts and practices of Defendants, as set forth hereinabove, constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of Defendants' businesses in violation of RSA 358-A:2.  Specifically, Defendants have illegally:

    a.   Created and carried out unreasonable restraints of trade or commerce by, e.g. setting by agreement the prices which the Defendants charged for Magazine Paper manufactured, marketed and sold in and/or distributed to New Hampshire;

    b.   Prevented competition in the manufacture and sale of Magazine Paper manufactured, marketed and sold in and/or distributed to New Hampshire by e.g., agreeing and conspiring among themselves not to compete over sales volumes and prices;

    c.   Fixed the price of Magazine Paper in such a way as to control or establish, or attempt to control or establish the prices paid by indirect purchasers and the public for Magazine Paper; and

    d.   Entered into, executed, and carried out a contract, combination or conspiracy in which they established and settled the price of Magazine Paper so as to directly or indirectly preclude a free and unrestricted competition among themselves.

107.   By reason of the violations of NH RSA 358-A:2, Plaintiff and members of the Class have suffered loss of money in that they have paid more for Magazine Paper than they would have in the absence of the unfair and deceptive acts or practices.

108.    As persons injured directly or indirectly by Defendants' unlawful conduct, Plaintiff and the Class are entitled to actual damages, restitution, and other equitable relief including a permanent injunction, attorneys' fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

a.    The Court adjudge and decree that the Plaintiff is a fair and adequate representative of the Class, as hereinabove defined;

b.    The Court enter judgment for the Plaintiff and award restitution, compensatory damages, interest and costs;

c.    The Court award treble damages;

d.    The Court award attorneys' fees and the costs of suit, including experts' fees, as allowed by law;

e.    The Court enjoin Defendants from continuing their unfair methods of competition and unfair or deceptive acts or practices; and

f.    The Court grant such other relief as it may deem just and equitable.

## JURY TRIAL DEMANDED

Plaintiff, on behalf of herself and all others similarly situated, hereby demands a trial by jury on all issues so triable as a matter of right.

26